The instant appeal has been taken from a final judgment of the Lake County Court of Common Pleas. Appellant, Michael S. Jenkins, seeks the reversal of his conviction on one count of passing a bad check, pursuant to R.C. 2913.11(A).
In the late 1980's, appellant formed a construction supply company known as Raycor, Incorporated. Essentially, Raycor was engaged in the business of acting as a middleman between the manufacturers of construction supplies and certain construction companies. That is, whenever the construction companies would indicate that they needed supplies, Raycor would buy the supplies from the manufacturers or wholesalers, and then resell the supplies to the construction companies.
Appellant was the sole owner and primary salesman for Raycor. In addition to a secretary, appellant employed two other salesmen, one of whom was his brother, Tim Jenkins. Although Raycor did provide certain supplies to the city of Cleveland, its primary clients were construction companies which were involved in the building of the new baseball stadium and arena in Cleveland, Ohio.
In early 1993, Raycor entered into an agreement to purchase guardrail materials from the Able Contracting Group. The total price for the materials was $2,494. Upon buying the materials from Able, Raycor resold them to the city of Cleveland.
In late March 1993, Able's accounting manager, Shirley Bate, received a check from Raycor for the entire purchase price of the guardrail materials. This check was signed by appellant in behalf of Raycor. Upon receipt of the check, Bate deposited it in Able's bank account. A few days later, Able's bank returned the check to Bate, indicating that there had been insufficient funds in Raycor's account with National City Bank to cover the amount of the check.
Bate immediately telephoned Raycor and spoke with an individual who identified himself as appellant. This individual told Bate to attempt to redeposit the check because sufficient funds were now in Raycor's account. Based on this assurance, Bate again gave the check to Able's bank on April 6, 1993. However, Raycor's check was again returned to Bate on the basis of insufficient funds.
After informing her superior of the situation, Bate contacted the Eastlake City Police Department. Officer Frank Cochran was then dispatched to Able to investigate. Upon learning of the underlying facts from Bate, Officer Cochran told her that it was the department's policy not to become involved in this type of matter until the creditor had sent a certified letter advising the debtor again that he needed to make final payment on the debt.
In compliance with the department's requirement, Bate mailed a certified letter to appellant and Raycor. In response, she received both a telephone call and a letter. The telephone call was from a person who identified himself as "Mr. Jenkins." The letter was purportedly from appellant.
The gist of the call and the letter was that the check had bounced twice because Raycor had not received any payment from the city of Cleveland for the guardrail materials. The Raycor representative then asked if Able would accept a partial payment of $1,300 at that time, with the remaining amount to be paid one month later. Bate responded that Able's policy was not to accept a partial payment.
After not receiving any new form of payment from appellant and Raycor within a reasonable time, Able again contacted the Eastlake City Police Department. Once he had been updated on the situation, Officer Cochran telephoned Raycor and spoke to an individual who identified himself as appellant. When Officer Cochran stated that Able would be bringing a complaint for nonpayment on the original check, the individual indicated that he would issue a new certified check to Able immediately.
When Able had not received a new check within four days, Officer Cochran again called Raycor and spoke to the same individual. This time, the individual stated that the company did not have the funds to pay the debt. Accordingly, Officer Cochran told the individual that the matter would be referred to the Willoughby Municipal Court and that a warrant for his arrest would be issued after the complaint had been filed against him.
The complaint against appellant was issued on May 28, 1993. Over the next three months, officers from the Eastlake City Police Department attempted twice to serve appellant with summons on the complaint. The second time, the officers went to both Raycor's business address and appellant's home address. Despite this effort, appellant was never served in 1993.
During this same general time period, Raycor experienced a serious decrease in the amount of its business because many of the construction companies had started to deal directly with the manufacturers and wholesalers. As a result, appellant began to wind down his company's business and ultimately dissolve the corporation. Appellant then started to work as a carpenter at his father's business, but he was subsequently laid off due to a lack of work. In turn, this forced appellant to leave his personal residence and move in the home of his wife's family.
In February 1997, appellant was stopped for a traffic offense in North Randall, Ohio. In running a routine check on appellant's background, the citing officer learned that there was an outstanding warrant against him stemming from the complaint filed by Able. Thus, appellant was placed under arrest and brought before the Willoughby Municipal Court. After appellant had been released on bond, the matter was bound over to the Lake County Court of Common Pleas, and the Lake County Grand Jury returned a single-count indictment against him in May 1997.[1]
An abbreviated jury trial was held in October 1997. As part of its case-in-chief, the state presented the testimony of Shirley Bate and Officer Cochran. Both of these witnesses expressly stated in their respective testimony that when they had first spoken on the telephone with the individual from Raycor about the check, the individual had identified himself as appellant.
The state also submitted the testimony of the manager of the bank office at which Raycor had its checking account. After reviewing certain documents kept by the bank, the manager asserted that the company's account had had a negative balance for many days during March and April 1993. He also stated that the account had had sufficient funds to pay the "Able" check on only two days during this period, and that Raycor had bounced a number of other checks immediately before the "Able" check had been issued. As to the latter point, the manager testified that an overdraft notice would have been mailed to Raycor each time a check had bounced. Finally, the manager indicated that, twice during this particular period, Raycor had deposited considerable funds in the account, but that the funds had been immediately withdrawn through cashier's checks.
In testifying in his own behalf, appellant expressly denied that he had ever talked to Bate or Officer Cochran in 1993. Although he admitted that the signature on the "Able" check had been his, appellant also denied that he had ever issued the check. In relation to the latter point, he stated that when Raycor's business had started to decrease, he has essentially handed the company over to his brother and told him to pay the remaining debts as they became due. According to appellant, he had signed some blank checks in early March 1993 and had given them to his brother to use. Based upon this, appellant testified it had been his brother who had issued the check at issue, had spoken to Bate and Officer Cochran on the telephone, and had sent the response letter to Able.
Appellant also presented the testimony of a handwriting expert. This witness stated that, upon comparing the signatures on the check at issue and on Raycor's response letter to Able, he had concluded that the two signatures had not been made by the same individual. This testimony supported appellant's contention that he had not signed the response letter.
In rebuttal, the state recalled Officer Cochran. The focus of the rebuttal testimony was a conversation Officer Cochran had with appellant during the preliminary hearing before the Willoughby Municipal Court in February 1997. Officer Cochran testified that when he asked appellant why he had not paid the debt to Able in 1993, appellant did not mention his brother.
Based upon the foregoing evidence, the jury returned a guilty verdict as to the sole charge of passing a bad check. Accordingly, the trial court sentenced appellant to a definite sentence term of eighteen months in a state penitentiary; however, the court then suspended the sentence and placed appellant on probation for two years.
In now appealing his conviction, appellant has assigned the following as error
 "1. The jury instructions given by the trial court created an impermissible 'mandatory presumption' and thereby violated the defendant's right to due process as guaranteed by the Fourteenth Amendment.
 "2. The trial court erred to the prejudice of defendant-appellant in denying the motion for acquittal made pursuant to Crim.R. 29(A).
 "3. The trial court erred to the prejudice of defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."
Following the close of the evidence, the state submitted a proposed jury instruction concerning an evidential presumption which related to an element of the charged crime. After appellant had objected to the proposed instruction, the trial court ruled that the instruction would be included in the general charge to the jury because it was consistent with the statutory law on the matter. Under his first assignment, appellant submits that the instruction in question should not have been given because it created a mandatory presumption which shifted the burden of proof on an element of the offense.
As was noted above, appellant was found guilty of passing a bad check under R.C. 2913.11. Division (A) of this statute prohibits a person from issuing a check when (1) the person knows that the check will be dishonored; and (2) the person has an intent to defraud.
Division (B) of the statute then delineates an evidential presumption which relates to the "dishonor" element of the offense. Specifically, the division states that a person issuing a check can be presumed to have knowledge that the check will be dishonored when:
 The check * * * was properly refused payment for insufficient funds upon presentment within thirty days after issue or the stated date, whichever is later, and the liability of the drawer * * * is not discharged by payment or satisfaction within ten days after receiving notice of dishonor."
In submitting the disputed instruction, the state clearly tried to mimic the foregoing statutory language. Our review of the trial court's charge to the jury shows that, after defining the term "dishonor" as the refusal to make payment upon presentment of the check, the court stated:
 "If you find beyond a reasonable doubt that the check was properly refused payment for insufficient funds upon presentation within 30 days after issue or the date set forth in it, whichever was later, [and] the obligation was not paid within 10 days after notice of dishonor was received by the defendant[,] a presumption of law arises that the defendant knew the check would be dishonored.
 "Notice of dishonor may be given by any person, it may be given by any commercial [sic] reasonable means including an oral, written or electronic communications and is sufficient if it reasonably identifies the instrument and [states] the instrument has been dishonored or has not been paid or accepted. The return of an instrument given to a bank for collection is sufficient notice of dishonor.
 "The law declares that you may regard the failure to pay the obligation within 10 days after notice of dishonor if established beyond a reasonable doubt as sufficient evidence of knowledge that the check would be dishonored, however, it does not require you to do so. This presumption is in the nature of evidence and is sufficient proof of knowledge that the check would be dishonored unless it is rebutted by evidence of equal or greater weight.
 "The existence of presumption does not relieve the state of the duty of establishing knowledge that the check would be dishonored beyond a reasonable doubt."
In now arguing that the foregoing instruction was improper, appellant focuses upon the final phrase in the first paragraph. This phrase stated that the presumption "arises" whenever the state has established the underlying facts. Appellant asserts that the use of the word "arises" implied that the presumption was mandatory; i.e., the phrase could be interpreted to mean that the jury was always required to follow the presumption. Based on this, appellant further asserts that the wording had the effect of relieving the state of it burden of proof on the dishonor element.
As appellant aptly notes, the United States Supreme Court has expressly held that a mandatory evidential presumption violates a criminal defendant's right to due process because it always requires the jury to infer the existence of a fact whenever the state has proven certain underlying facts. Stated differently, a mandatory presumption relieves the state of the burden of demonstrating the ultimate fact because it is only required to prove the underlying facts. On the other hand, a permissive evidential presumption is constitutional because the state is still required to convince the jury that the inference should be made in light of all of the facts in the case. SeeFrancis v. Franklin (1985), 471 U.S. 307, 314.
Regarding the issue of whether a specific presumption is mandatory or permissive, the court has stated that the use of "commanding" language in the instruction is a clear indication that the jury will deem itself foreclosed from rejecting the factual inference. For example, the court has concluded that the phrase "shall be presumed" can only be interpreted by a jury to preclude any independent consideration of whether the ultimate fact had been established. Carella v. California
(1989), 491 U.S. 263, 265.
Nevertheless, the Supreme Court has further stated that a presumption instruction must always be considered in the context of the entire charge to the jury:
 "Analysis must focus initially on the specific language challenged, but the inquiry does not end there. If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion on an element of an offense, the potentially offending words must be considered in the context of the charge as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the charge to have created an unconstitutional presumption." Francis at 315.
In relation to the latter point, the Francis court emphasized that, in order for other statements in the jury instructions to correct "infirm" language concerning an evidential presumption, those other statements cannot merely contradict the "infirm" language. Instead, the other statements must explain the "infirm" language to the extent that a reasonable juror could not have concluded that the burden of proof on the element had shifted. Id. at 322.
In the instant appeal, this court would certainly agree that the language in the first paragraph of the presumption instruction could have been interpreted by any reasonable juror as requiring him to follow the presumption any time the predicate facts had been established. In the absence of any qualifying statements, the word "arises" could have been interpreted as having a commanding tone which foreclosed the possible rebuttal of the presumption.
Nevertheless, in the third paragraph of the quoted jury instructions, the trial court essentially restated the presumption. As part of that paragraph, the court specifically indicated that the jury "may" regard the failure to pay within ten days after notice of dishonor as sufficient evidence to establish the fact that appellant had had knowledge that the check would be dishonored. The court then explained that the jury was not required to reach that conclusion if it chose not to. Finally, in the fourth paragraph of the instruction, the court reminded the jury that the existence of the presumption did not relieve the state of its ultimate burden of establishing the dishonor element beyond a reasonable doubt.
Because of the proximity of the two paragraphs, the jury in this action could have only concluded the statements in the third paragraph were applicable to the presumption which had been delineated in the first paragraph. Furthermore, given the permissive language in the third paragraph, a reasonable jury could have only concluded that it was not necessarily required to apply the presumption simply because the state had proven the underlying facts. That is, the third paragraph explained the presumption to such an extent that, despite the wording of the first paragraph, the only reasonable interpretation of the entire instruction was that the presumption was not mandatory. In addition, the trial court's reference to the burden of proof in the fourth paragraph reiterated to the jury that, in determining whether the state had established the dishonor element of the offense, the presumption had to be considered in the context of the other evidence.
Citing Francis, appellant contends that the reference to the burden of proof was not sufficient to correct the mandatory language in the first paragraph of the presumption instruction. However, in Francis, the single reference to the burden of proof was set forth in a separate section of the entire charge to the jury; i.e., there was no separate reference to the burden in the presumption instruction. In contrast, the trial court in this case gave both a general instruction on the burden issue and a separate reference to the issue as part of the presumption instruction. By including the separate reference, the trial court ensured that the jury did not misunderstand the effect of the presumption.
Although the first paragraph of the presumption instruction, by itself, could have created a mandatory presumption, this court holds that the entire inqtruction was legally sufficient to inform the jury that the "knowledge of dishonor" presumption could be rejected even if the state established the underlying facts.
As part of his first assignment, appellant further submits that the trial court erred in instructing the jury concerning the quantity of evidence he had to present in order to rebut the evidential presumption. As was noted above, the trial court told the jury that, in order to rebut the state's evidence on the presumption, appellant had to submit evidence "of equal or greater weight." Appellant maintains that this statement was improper because it required him to rebut the evidential presumption by proof beyond a reasonable doubt.
Our review of the relevant case law indicates that the trial court's statement about appellant's burden was legally correct. In State v. Myers (1971), 26 Ohio St.2d 190, the Supreme Court of Ohio stated that the quantity of evidence necessary to rebut an evidential presumption depends upon which party has the ultimate burden of proof:
 " 'The degree of proof necessary to remove a presumption is not to be confused with the degree necessary to sustain the burden of proof. When a party is not required to sustain the burden of proof upon some particular issue, a rebuttable presumption arising out of such issue may be overcome by evidence which counterbalances the evidence to sustain the presumption; however, when such party is required to assume the burden of proof upon an issue, any rebuttable presumption arising therefrom must be removed by the same degree of proof necessary to sustain the issue.' " Id. at 201-202, quoting Kennedy v. Walcutt (1928), 118 Ohio St. 442, paragraph five of the syllabus.
Because knowledge of dishonor is an element of the crime of passing a bad check, the state bore the ultimate burden of proving the factual issue to which the evidential presumption in this case pertained. As a result, pursuant toMyers, appellant was only required to present counterbalancing evidence in attempting to rebut the presumption. To this extent, the trial court's instructions complied with Myers
because it required appellant to submit evidence of equal or greater weight than that presented by the state.
Although not expressly stated in Myers, its holding is obviously predicated on the assumption that, in order to establish the presumption initially, the state is not required to prove the underlying facts beyond a reasonable doubt. Instead, the state must only submit some evidence on the underlying facts. It is only the ultimate fact, based on the presumption and the state's other relevant evidence, which must be proven beyond a reasonable doubt.
In turn, because the state is only required to present some evidence in order for the presumption to arise, it follows that the defendant is only required to submit that same amount of evidential materials in rebutting the presumption. In this respect, the defendant is not required to sustain any burden of proof in rebutting the presumption, but is merely obligated to submit a quantity of evidence equal to that presented by the state. Accordingly, the instruction in this case did not place a burden upon appellant to rebut the evidential presumption beyond a reasonable doubt. See State v. Huber (Sept. 25, 1980), Shelby App. No. 79 CA 3, unreported.
Because no aspect of the trial court's instruction on the "knowledge of dishonor" presumption violated appellant's due process rights, his first assignment of error lacks merit.
Under his second assignment, appellant maintains that the sole charge against him should have been dismissed because, even if the state's evidence is viewed in a manner most favorable to it, that evidence was not sufficient to support a conviction under R.C. 2913.11 (A). Essentially, appellant contends that the state failed to demonstrate that he had issued the check in question with the intent to defraud Able.
The term "defraud" is defined in R.C. 2913.01(B) as "* * * to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception some detriment for another." In trying to apply this definition to the facts of this case, appellant argues that the "defraud" element of R.C.2913.11(A) was not met because there was no indication that he had obtained any benefit from issuing the check to Able. Stated differently, he asserts that the offense of passing a bad check cannot be based on the issuance of a check to cover a pre-existing debt.
However, as the state aptly notes, this court previously rejected this argument in State v. Doane (1990), 69 Ohio App.3d 638. In that case, we began our analysis of the issue by indicating that, in State v. Lowenstein (1924), 109 Ohio St. 393, the Supreme Court of Ohio had concluded that the "victim" of a bad check did not have to obtain a financial disadvantage in order for fraud to be proven. Based on this, the Supreme Court held that the drawer of a bad check for a pre-existing debt receives an unfair advantage over his creditor because the creditor believes that the debt has been paid when, in actuality, it has not.
Upon concluding that there is no difference between gaining an "advantage" and gaining a "benefit" from the issuance of a bad check, the Doane court ultimately held that the Lowenstein
precedent was still binding. Therefore, we further held that a check given for a pre-existing debt can form the basis of a violation of R.C. 2913.11 (A). We emphasized the present statutory definition of "defraud" does not state that something of value must be obtained by the use of deception.
Appellant argues that Doane is distinguishable on the basis that, because the Doane defendant had control over the financial books of the entity to which she owed the debt, she had the opportunity to conceal the fact that her check had bounced. However, even though the Doane court referenced this fact, there is no language in the opinion which would support the conclusion that the decision was predicated solely on that specific point. Instead, our reliance upon Lowenstein supports the conclusion that the avoidance of paying a debt in a timely manner constitutes a benefit for purposes of the definition of "defraud" under R.C. 2913.01(B).
As an aside, this court would further note that, pursuant to the statute, "defraud" also is defined as knowingly causing a detriment to another by deception. Under the Doane analysis, the passing of a bad check for a pre-existing debt would readily cause a detriment to the creditor because he would lose the benefit of having possession of the funds during the period in the debt remained unpaid. In this case, Able could have been collecting interest on the $2,494 for a number of years if appellant had paid the debt when it originally became due.
The dismissal of a charge on the basis of insufficient evidence is not warranted if the evidence is such that reasonable minds could reach different conclusions concerning whether each element of the offense has been proven beyond a reasonable doubt. State v. Bridgeman (1978), 55 Ohio St.2d 261. In the instant case, the state did present some evidence upon which a reasonable person could conclude that appellant had knowingly used deception to either gain a benefit for himself or cause a detriment to Able. Thus, as there was some evidence which tended to show an intent to defraud, the trial court did not err in overruling appellant's motion for a judgment of acquittal. Appellant's second assignment of error is not well taken.
Under his last assignment, appellant submits that his conviction should be reversed because the jury verdict was against the manifest weight of the evidence. Specifically, he contends that the evidence did not support the finding that he had had knowledge that the check in question had been dishonored. Appellant argues that, in relation to this factual issue, the jury should have found that only his brother had received notice that the check had bounced.
As was noted above, R.C. 2913.11(B)(2) states that knowledge that a check will be dishonored may be presumed if the drawer does not discharge the debt by payment within ten days after receiving notice of dishonored. In interpreting this statute, the courts of this state have held that the defendant must have received "actual notice" of the prior dishonor before the presumption could apply. See State v. Durbin (1992), 83 Ohio App.3d 156,162.
Our review of the trial transcript in this case shows that conflicting testimony was presented on the notice issue. In testifying in his own behalf, appellant stated that, as of March 1993, he had given control of Raycor over to his brother. He further stated that he could not recall ever speaking to Bate or Officer Cochran in 1993 about this matter. Moreover, appellant presented expert testimony showing that he had not signed the response letter in which Able was asked to accept a partial payment.
On the other hand, both Bate and Officer Cochran expressly testified that, on at least one occasion after the first time the check had bounced, they had talked on the telephone with an individual at Raycor who identified himself as appellant. In addition, the bank manager stated that after the check had initially been returned for insufficient funds, Raycor would have received a notice from the bank stating what had occurred.
Given the conflicting evidence, it follows that the jury's finding on the notice issue turned upon its determination of the credibility of the various witnesses. Our review of that testimony does not support the conclusion that the jury abused its discretion in essentially finding that the state's witnesses were most credible. As to this point, we would emphasize that even if the jury believed appellant's assertion that he had handed the operation of the business over to his brother, it still could have found that appellant had received notice of the initial dishonor. That is, the jury could have found that even if the brother had completed the check and signed the response letter, appellant still had sufficient contact with the business that he had to have been aware of the situation.
Stated differently, the evidence before the jury supported the finding that, given the sheer volume of instances in which appellant could have received actual notice, it was simply unbelievable that he had no knowledge that the check had been returned for insufficient funds.
As part of this assignment, appellant also argues that jury erred in not finding that, consistent with the trial court's rebuttal instruction, his evidence on the notice issue had been of greater weight than the state's evidence. However, again, if the jury found that his evidence was not as credible, it could have also concluded that appellant should not be accorded equal weight.
As this court has noted on numerous occasions, questions of witness credibility and the weight to be given to the evidence are primarily matters for the trier of fact. See, e.g., Statev. Davis (Dec. 31, 1998), Lake App. No. 97-L-246, unreported. Therefore, a criminal conviction will be reversed on the basis of manifest weight only when it is evident that the jury lost its way in assessing the evidence. State v. Thompkins (1997),78 Ohio St.3d 380, 387.
As the record before this court does not support the conclusion that the jury lost its way in assessing the evidence, the jury verdict was not against the manifest weight of the evidence. As a result, the final assignment of this appeal does not have merit.
The judgment of the trial court is affirmed.
 ---------------------------------- PRESIDING JUDGE DONALD R. FORD
CHRISTLEY J., NADER, J., concur.
[1] As an aside, this court would note that the indictment against appellant did not contain any reference to Raycor, Incorporated. In fact, our review of the entire record indicates that the question of whether appellant had been acting as an agent of the corporation, or whether the corporate veil of this single-shareholder corporation had been pierced, was never raised during the trial proceeding. Because the failure to raise the issue constitutes a waiver of the point, this opinion will not address this question.